NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0330n.06

Case No. 24-5781

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED
Jul 08, 2025
KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| DONTAVIOUS BOND, | ) | |
| Defendant-Appellant, | ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF TENNESSEE |
| v. | ) ) | |
| UNITED STATES OF AMERICA, | ) ) | |
| Plaintiff-Appellee. | ) | O P I N I O N |

Before: THAPAR, NALBANDIAN, and READLER, Circuit Judges

**NALBANDIAN, Circuit Judge**. Dontavious Bond pleaded guilty to possessing a firearm and ammunition as a felon. To find his Guidelines range, the district court cross-referenced the Guideline for attempted first-degree murder after finding Bond used his firearm while trying to kill several gang members. The court then granted Bond a two-point reduction for acceptance of responsibility, but the government declined to move for a third. So the court determined Bond's Guideline range, considered the statutory sentencing factors, and imposed the statutory maximum sentence of 120 months' imprisonment. Bond appeals the procedural reasonableness of his sentence. We AFFIRM.

**I.**

In March 2022, gang enforcement officers with the Jackson Tennessee Police Department began investigating gunfire in a liquor store parking lot. The officers reviewed surveillance footage from the store that showed a March 12 shooting. The first video showed two cars—a white Jeep and a silver Lexus—parked in front of the store. Two people got out of the white Jeep

and walked into the store. Police later confirmed one of the individuals was Jordan Williams (wearing a red hoodie) and the other was Dontavious Bond (wearing a gray hoodie). Moments later, four people got out of the silver Lexus and entered the store.

Bond and Williams left the store first and, by now, Bond had taken off his hood and was wearing a gray beanie. Williams got back into the Jeep while Bond walked past the car and out of frame. Then the Jeep left, and another camera showed that Bond walked behind a building next to the liquor store. The group from the silver Lexus also walked out of the store and began entering their car. But then Bond reappeared from behind the adjacent building and fired eight shots, which can be seen by the muzzle flashes from his firearm. From the liquor store's front cameras, the Lexus's passengers can be seen running away. One of the passengers began shooting into the air and at random cars in the parking lot before the Lexus drove away. Jackson police found the Lexus's owner and confirmed that bullets struck the driver-side door.

During this investigation, Bond was arrested on an unrelated charge. While Bond was in jail, officers recorded a call he had on March 19 with Sicily Ozier. Bond told Ozier that there was a "whatchamacallit" in his car, and Ozier expressed wanting to have a gun with her. R.78, Sentencing Hr'g, p.48, PageID 338. So Bond directed her to have his grandfather bring her the firearm. After the officers listened to the call, they went to speak with Ozier. She told police that gang members affiliated with the Lexus's occupants had shot at her residence a few months earlier because they believed Bond stole from them. She also confirmed that Bond drove a white Jeep. The officers asked her about the gun Bond mentioned in the jail call and she turned over to them a 9mm Beretta.

A forensic firearm examiner later confirmed the eight shell casings found at the scene of the shooting came from the recovered Beretta. Jackson police then gave the firearm to federal

investigators who indicted Bond on two counts related to the March 12 liquor store shooting: one count of being a felon in possession of a firearm and one count of being a felon in possession of ammunition, both in violation of 18 U.S.C. § 922(g)(1). Bond pleaded nolo contendere to both counts.

At sentencing, the district court reviewed the surveillance footage and heard testimony from two Jackson police officers. It then adopted the factual findings in the Presentence Report, and concluded Bond used the unlawfully possessed firearm during the commission of another offense. And that other offense was attempted first-degree murder. Bond objected and argued the proper cross-reference was to aggravated assault, which would make his base offense level much lower than it would be for attempted murder. But the court rejected this argument because it found Bond's shooting "was a premeditated act, in that he intentionally hid in the darkness, waited for the other four individuals to exit the store, and then stepped toward the silver SUV, and fired . . . eight shots." R.98, Sentencing Hr'g, p.137, PageID 1136. So applying the Guidelines' cross-reference to attempted first-degree murder, Bond's base offense level was 33.

The court then gave Bond a two-point reduction for acceptance of responsibility and asked the government if it would move for the third point. The government declined because it claimed Bond "frivolously contest[ed] every factual allegation in the presentence report." *Id.* at p.142, PageID 1141. So the court did not award the point.

With a total offense level of 31 and a criminal history category of three, the court determined Bond's Guidelines range was 135 to 168 months. But the offense was subject to a statutory cap of 120 months' imprisonment. After reviewing the § 3553(a) factors, the court imposed the maximum term of 120 months' imprisonment followed by three years of supervised release. Bond appealed his sentence.

**II.**

Bond argues that the district court erred in calculating his Guidelines range for two reasons: (1) it incorrectly cross-referenced the attempted-murder guideline, and (2) it erroneously refused to grant the third-point reduction for acceptance of responsibility.  This is a claim of procedural unreasonableness.  *United States v. Gould*, 30 F.4th 538, 542 (6th Cir. 2022).  We typically review these claims for an abuse of discretion.  *Id.*  A district court abuses its discretion when it makes a legal error, an erroneous factfinding, or an obvious error of judgment.  *United States v. Simpson*, 138 F.4th 438, 445 (6th Cir. 2025).  And these errors come with their own standards of review: we review legal errors de novo, such as misinterpretations of the Guidelines' text, but review factual findings for clear error.  *United States v. Bailey*, 931 F.3d 558, 562 (6th Cir. 2019).

We defer to a district court's factual finding unless we are "left with the definite and firm conviction" that the court made a mistake.  *United States v. West*, 962 F.3d 183, 187 (6th Cir. 2020) (quoting *United States v. Orlando*, 363 F.3d 596, 603 (6th Cir. 2004)).  It is not enough that the defendant offers a "competing view of the evidence."  *United States v. Mills*, 126 F.4th 470, 475 (6th Cir. 2025) (internal quotation marks omitted).  Rather, "to prevail, [the defendant] must demonstrate that his view of the evidence is the *only* view."  *Id.* (internal quotation marks omitted).

**A.**

The relevant guideline for a violation of § 922(g)(1) is U.S.S.G. § 2K2.1.  Under § 2K2.1(c)(1)(A), if the defendant used the unlawfully possessed firearm or ammunition "in connection with the . . . attempted commission of another offense" the court must apply U.S.S.G. § 2X1.1.  Section 2X1.1 then directs the court to reference the relevant attempt offense expressly covered in the Guidelines.  And if the referenced offense level is different from the typical § 2K2.1 offense level, the court adopts the higher level.  U.S.S.G. § 2K2.1(c)(1)(A).

The district court followed these steps, and the parties agreed a cross-reference should be applied. But they disagree about *which* cross-reference to apply. The court relied on the attempted first-degree murder guideline in U.S.S.G. § 2A2.1 over an objection by Bond arguing that the proper cross-reference offense is to the aggravated assault guideline in § 2A2.2. And since the attempted first-degree murder guideline provided a base offense level of 33, which is above any base offense level in § 2K2.1, the court began its calculations at offense level 33. *See United States v. Howell*, 17 F.4th 673, 689–90 (6th Cir. 2021); *see also United States v. James*, 575 F. App'x 588, 591–92 (6th Cir. 2014).

Bond claims the attempted first-degree murder cross-reference does not apply because he lacked the specific intent to kill. But based on the record, there was no error in the judge's factual finding on Bond's intent. *See United States v. Krimsky*, 230 F.3d 855, 860 (6th Cir. 2000) ("Whether a defendant has the requisite intent . . . is a question of fact. . . ."). We begin with the attempted-murder guideline, § 2A2.1. The commentary defines "first degree murder" by referencing 18 U.S.C. § 1111. U.S.S.G. § 2A2.1 cmt. 1. Under that statute, first-degree murder includes "[e]very murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing." 18 U.S.C. § 1111.

While murder may be committed without an intent to kill, *attempted* murder "requires a specific intent to kill." *Howell*, 17 F.4th at 690 (quoting *Braxton v. United States*, 500 U.S. 344, 351 n.* (1991)). When the record supports the finding that the defendant aimed and fired his firearm at a specific individual or group, we can infer a specific intent to kill. *Id.* at 690; *United States v. Bradford*, 822 F. App'x 335, 339 (6th Cir. 2020) (citing *United States v. Rios*, 830 F.3d 403, 442 (6th Cir. 2016) to show that "specific intent to kill could be inferred from a defendant

firing a gun at a group of individuals"). The same is true when a defendant shoots at a car that his target is in. *James*, 575 F. App'x at 596–97.

The district court found Bond had the specific intent to kill because he lay in wait before shooting at the silver Lexus and its occupants. R.98, Sentencing Hr'g, pp.139–40, PageID 1138–39. This finding was not clearly erroneous. The videos presented at sentencing showed that Bond exited the liquor store, hid behind an adjacent building, waited for the occupants to exit the store, and then stepped toward their car and fired eight shots towards it. Bond aimed his gun at the victims, and then fired. "This fact alone supports a finding of specific intent . . . ." *United States v. Grant*, 15 F.4th 452, 458 (6th Cir. 2021). We have previously "upheld a district court's finding of intent to kill based solely on the fact that the defendant shot in the victims' direction such that the bullet could have struck her." *Id.* (citation modified). So too here.

But Bond did more than just shoot in the direction of the silver Lexus and its occupants. When Bond left the liquor store, he did not leave in the car he came in with the person he came with. Instead, he walked behind an adjacent building and waited for the other group to walk out. That Bond lay in wait for the occupants to exit the store and approach their vehicle is enough to infer his premeditated and specific intent to kill the occupants. *See United States v. Simmons*, 633 F. App'x 316, 320 (6th Cir. 2015) (finding specific intent to kill when the defendant ambushed and shot the victim in a parking lot after "lying in wait" for him to get off work).

By extension, Bond's alternative framing of the facts—that the shooting was just aggravated assault—fails. The "district court's factual finding is not clearly erroneous so long as the finding is plausible in light of the record viewed in its entirety." *United States v. Miller*, 73 F.4th 427, 430 (6th Cir. 2023) (internal quotation marks omitted). And Bond's conduct—hiding behind an adjacent building waiting for the car's occupants to appear and shooting at them—makes

plausible that he intended to kill the occupants of the silver Lexus.  So the court did not err in cross-referencing the attempted-first-degree-murder guideline and using that to calculate Bond's offense level.[1]

**B.**

Next Bond argues that the government arbitrarily refused to move for a third-point reduction for acceptance of responsibility.  But we need not reach this issue because any alleged error was harmless.

The district court may decrease a defendant's offense level by two points if the defendant accepted responsibility for the offense.  U.S.S.G. § 3E1.1(a).  After that, the government may move for an added one-point reduction.  *Id.* § 3E1.1(b).  But that decision is entirely within the government's discretion, and this court will not review it unless the government denied the point arbitrarily or for a constitutionally impermissible reason.  *United States v. Lapsins*, 570 F.3d 758, 770 (6th Cir. 2009).  Still, any error must be harmful.  *United States v. Campbell*, 135 F.4th 376, 397 (6th Cir. 2025).  "Errors that do not affect the ultimate Guidelines range . . . are harmless and do not require resentencing."  *United States v. Cruz*, 976 F.3d 656, 663 (6th Cir. 2020).

The district court determined that Bond's Guidelines range without the third acceptance-of-responsibility point was 135 to 168 months' imprisonment.  Had Bond received the added one-point reduction, his total offense level would be 30 instead of 31.  With a criminal history category of three, his Guidelines range would be 121 to 151 months.  But Bond's offense was subject to a

---

[1] Bond also argues that Officer Cepparulo's testimony at sentencing did not confirm whether Bond fired directly at the silver Lexus.  This mischaracterizes Cepparulo's testimony.  While Cepparulo admitted that the videos do not show both Bond's shooting and the Lexus in the same frame, he explained repeatedly how the direction of Bond's shots can be gleaned from the location of the cameras, the muzzle flashes, the bullet holes in the car, and the car's occupant's reactions.  So, at best, Bond offers "a competing view" of the evidence, which is not enough to prevail.  *See Mills*, 126 F.4th at 475 (internal quotation marks omitted).

120-month statutory maximum sentence.[2] 18 U.S.C. § 924(a)(2) (amended 2022). So the court determined that the "range [wa]s restricted at 120 months" and then considered the § 3553 factors. R.98, Sentencing Hr'g, pp.144–45, PageID 1143–44. After discussing Bond's "extremely concerning criminal history" and the seriousness of his offense (including his attempted first-degree murder), the court imposed the 120-month maximum. *Id.* at pp.160–65, PageID 1159–64.

When "the statutory mandatory sentence falls below the guideline range, the statutory maximum sentence *is* the guideline sentence." *United States v. Carter*, 444 F. App'x 862, 864 (6th Cir. 2011) (emphasis added); *see also Koons v. United States*, 138 S. Ct. 1783, 1787 (2018). So the trial court found that the "range" was the 120-month statutory maximum. And that wouldn't have changed even if Bond had gotten the additional one-point reduction. Had Bond received that added reduction, his original, calculated Guidelines range would have been 121 to 151 months. And the 120-month statutory maximum would still have supplanted this range to become the new range. So, even assuming there was an error, it was harmless. *See United States v. Whyte*, 795 F. App'x 353, 366 (6th Cir. 2019) (holding application of a two-point enhancement was harmless when the enhancement did not change the total offense level and "the district court sentenced [the defendant] in accordance with a *mandatory* statutory scheme").

**III.**

For these reasons, we affirm.

---

[2] In June 2022, Congress raised the maximum penalty for § 922(g) violations from 120 months to 180 months. *See* 18 U.S.C. § 924(a)(8); *see also* Bipartisan Safer Communities Act, Pub. L. No. 117-159, 136 Stat 1313, 1329 (2022). But Bond committed his offense before Congress enacted that change. And so we apply the law as it was when the crime was committed, not when Bond was sentenced. *See generally Calder v. Bull*, 3 U.S. (3 Dall.) 386, 390 (1798) (holding that the ex post facto clause prohibits "[e]very law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed") (opinion of Chase, J.).